**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Gabbard v. Madison Local School Dist. Bd. of Edn.*, **Slip Opinion No. 2021-Ohio-2067.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2021-OHIO-2067

GABBARD ET AL., APPELLEES, *v.* MADISON LOCAL SCHOOL DISTRICT BOARD OF EDUCATION ET AL., APPELLANTS.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Gabbard v. Madison Local School Dist. Bd. of Edn.*, Slip Opinion No. 2021-Ohio-2067.]**

*Local boards of education—School employees—R.C. 109.78(D)—R.C. 2923.122(D)(1)(a)—Authorization to carry a deadly weapon or dangerous ordnance on school grounds—R.C. 109.78(D) prohibits a school from employing a person who goes armed while on duty in his or her job unless the employee has satisfactorily completed an approved basic peace-officer-training program or has 20 years of experience as a peace officer—Court of appeals' judgment affirmed.*

(No. 2020-0612—Submitted January 12, 2021—Decided June 23, 2021.)

APPEAL from the Court of Appeals for Butler County, No. CA2019-03-051, 2020-Ohio-1180.

_____

**O'CONNOR, C.J.**

{¶ 1} In April 2018, just over two years after a school shooting at Madison Junior/Senior High School that resulted in injuries to four students, appellant Madison Local School District Board of Education ("the board") passed a resolution to authorize certain school-district employees to carry a deadly weapon or dangerous ordnance on school property "for the welfare and safety of [its] students." This appeal asks us to determine whether that resolution complies with Ohio law. We conclude that it does not.

### Background and relevant statutes

{¶ 2} The 2016 shooting at Madison Junior/Senior High School is part of an alarming pattern of gun violence in American schools. A recent study identified 180 school shootings that occurred in the United States between 2009 and 2019. CNN, *10 years. 180 school shootings. 356 victims.*, https://www.cnn.com /interactive/2019/07/us/ten-years-of-school-shootings-trnd/#storystart (accessed June 1, 2021) [https://perma.cc/56KH-263L]. As parents, educators, and policymakers have confronted difficult questions about how to best protect students from harm, one response that has gained traction—especially following the tragic 2012 massacre at Sandy Hook Elementary School—has been a call to arm teachers and other school staff as an additional layer of security. *See* EducationWeek, *Should Teachers Carry Guns? The Debate, Explained*, https://www.edweek.org /leadership/should-teachers-carry-guns-the-debate-explained/2018/08 (accessed June 1, 2021) [https://perma.cc/A25T-D7ZF].

{¶ 3} In 2013, the year after the shooting at Sandy Hook Elementary School, more than 30 states introduced legislation relating to arming teachers or other school staff, and as of November of that year, seven states had passed such legislation. Council of State Governments Justice Center, *Arming Teachers and K-12 School Staff: A Snapshot of Legislative Action*, available at https://csgjusticecenter.org/wp-content/uploads/2020/01/NCSL-Arming-Staff-

Brief.pdf (accessed June 1, 2021) [https://perma.cc/YCV2-3BH3]. Ohio was not among those states. But that same year, then Ohio Attorney General Mike DeWine stated in a letter to the chairman of the Buckeye Firearms Association, "Ohio law does not prevent a local school board from arming an employee, unless that employee's duties rise to the level that he/she would be considered 'security personnel,' " in which case the employee would be required by statute to have specific training or experience. Buckeye Firearms Association, https://www.buckeyefirearms.org/sites/buckeyefirearms.org/files/publicfiles/pdf/ DeWine-109-78-ltr.pdf (accessed June 1, 2021) [https://perma.cc/MC55-AHXV]. The statutes that the attorney general cited in support of that opinion—R.C. 109.78(D) and R.C. 2923.122(D)(1)(a)—are the same statutes that govern our analysis here.

{¶ 4} Before turning to the specific circumstances of this case, we review those statutes. The first statute, R.C. 109.78(D), provides:

> No public or private educational institution or superintendent of the state highway patrol shall employ a person as a special police officer, security guard, or other position in which such person goes armed while on duty, who has not received a certificate of having satisfactorily completed an approved basic peace officer training program, unless the person has completed twenty years of active duty as a peace officer.

{¶ 5} The second statute, R.C. 2923.122, defines the criminal offenses of illegal conveyance into or possession in a school safety zone of a deadly weapon or dangerous ordnance.[1] R.C. 2923.122(A) and (B) respectively prohibit any person

---

1. A " '[s]chool safety zone' consists of a school, school building, school premises, school activity, and school bus." R.C. 2901.01(C)(1). The terms "school," "school building," and "school

from knowingly conveying or attempting to convey into or possessing in a school safety zone a deadly weapon or dangerous ordnance. The statute then carves out exceptions to those general prohibitions. Relevant here, the prohibitions established in R.C. 2923.122(A) and (B) do not apply to the following:

> [A] law enforcement officer who is authorized to carry deadly weapons or dangerous ordnance, a security officer employed by a board of education or governing body of a school during the time that the security officer is on duty pursuant to that contract of employment, or *any other person who has written authorization from the board of education or governing body of a school* to convey deadly weapons or dangerous ordnance into a school safety zone or to possess a deadly weapon or dangerous ordnance in a school safety zone and who conveys or possesses the deadly weapon or dangerous ordnance in accordance with that authorization.

(Emphasis added.) R.C. 2923.122(D)(1)(a). In other words, a person who possesses in or conveys into a school safety zone a deadly weapon or dangerous ordnance in accordance with written authorization from the board of education is not subject to criminal liability under R.C. 2923.122.

{¶ 6} The question presented here is whether the training or experience that R.C. 109.78(D) requires of a school employee who holds a "position [other than a special police officer or security guard] in which such person goes armed while on duty" applies to teachers, administrators, and other school staff whom a board of education has authorized to carry a deadly weapon in a school safety zone. This is

---

premises" are defined in R.C. 2901.01(C)(2) and R.C. 2925.01. The term "school activity" is defined in R.C. 2901.01(C)(3). And the term "school bus" is defined in R.C. 2901.01(C)(4) and R.C. 4511.01.

a pure question of law, which we review de novo. *See Progressive Plastics, Inc. v. Testa*, 133 Ohio St.3d 490, 2012-Ohio-4759, 979 N.E.2d 280, ¶ 15.

**Facts and procedural background**

{¶ 7} The board's April 2018 resolution "to allow armed staff" in a school safety zone states that, pursuant to R.C. 2923.122(D)(1)(a), the board will grant written authorization to individuals to be designated by the district's superintendent, who is currently appellant, Lisa Tuttle-Huff, to convey into and possess in a school safety zone deadly weapons or dangerous ordnance for the safety of the district's students. It goes on to state that a person so designated by the superintendent must be permitted under Ohio law to carry a concealed handgun, undergo response-to-active-shooter training, and "re-certify each year."

{¶ 8} The board subsequently adopted a "firearm authorization policy" for the purpose of implementing the April 2018 resolution. The policy states that, pursuant to R.C. 2923.122, the board will authorize up to ten school employees designated by the superintendent to carry concealed firearms in a school safety zone. It specifies that, to be so designated, an employee must maintain an Ohio concealed-handgun license, satisfactorily complete at least 24 hours of response-to-active-shooter training, hold a handgun-qualification certificate, receive training regarding mental preparation to respond to active killers, and pass a criminal-background check and mental-health exam. Neither the resolution nor the firearm-authorization policy requires designated persons to satisfy the training-or-experience requirement set out in R.C. 109.78(D).

{¶ 9} Appellees, Erin Gabbard, Aimee Robson, Dallas Robson, Benjamin Tobey, and Benjamin Adams (collectively, "the parents"), are parents of students enrolled in the Madison Local School District. They filed this action in the Butler County Court of Common Pleas in September 2018. They sought a declaratory judgment that the board's April 2018 resolution violates R.C. 109.78(D), and an injunction precluding the board from implementing the resolution as to any school

employee who has not satisfactorily completed an approved basic peace-officer-training program or who does not have 20 years of experience as a peace officer.[2]

{¶ 10} The trial court entered summary judgment in favor of appellants on the parents' claims for declaratory judgment and injunctive relief. Relying on "the context of the statute," the trial court determined that R.C. 109.78(D)'s training-or-experience requirement applies only to special police officers, security guards, and persons otherwise employed in a police capacity—positions that inherently require the employee to be armed while on duty. It therefore concluded that the training-or-experience requirement does not apply to teachers, administrators, and most other school employees.

{¶ 11} A divided panel of the Twelfth District Court of Appeals reversed the trial court's judgment on the parents' claims for declaratory judgment and injunctive relief. 2020-Ohio-1180, 153 N.E.3d 471, ¶ 21, 32. The majority rejected the trial court's limited reading of R.C. 109.78(D) and held that the statute unambiguously subjects to its training-or-experience requirement teachers and other school staff whom a board of education authorizes to carry a firearm while on duty. *Id.* at ¶ 17-19. It accordingly held that the April 2018 resolution violates R.C. 109.78(D) to the extent that it permits school employees without the statutorily required training or experience to carry a deadly weapon while on duty. *Id.* at ¶ 21.

{¶ 12} This court accepted appellants' discretionary appeal to address whether, under Ohio law, school teachers, administrators, and other school staff must satisfy the training-or-experience requirement in R.C. 109.78(D) in order to be authorized by a board of education to carry a firearm in a school safety zone while on duty. *See* 153 Ohio St.3d 1463, 2020-Ohio-3882, 150 N.E.3d 109.

---

2. The parents' complaint also included a claim for a writ of mandamus to compel appellants to release certain public records. The trial court resolved the mandamus claim separately from the parents' claims for declaratory judgment and injunctive relief, and that claim is not part of the appeal before this court.

**Analysis**

{¶ 13} Our paramount concern in examining a statute is the legislature's intent in enacting the statute. *State ex rel. Steele v. Morrissey*, 103 Ohio St.3d 355, 2004-Ohio-4960, 815 N.E.2d 1107, ¶ 21. To discern that intent, we first consider the statutory language, reading all words and phrases in context and in accordance with the rules of grammar and common usage. *Id.* We give effect to the words the General Assembly has chosen, and we may neither add to nor delete from the statutory language. *Columbia Gas Transm. Corp. v. Levin*, 117 Ohio St.3d 122, 2008-Ohio-511, 882 N.E.2d 400, ¶ 19. When the statutory language is unambiguous, we apply it as written without resorting to rules of statutory interpretation or considerations of public policy. *Zumwalde v. Madeira & Indian Hill Joint Fire Dist.*, 128 Ohio St.3d 492, 2011-Ohio-1603, 946 N.E.2d 748, ¶ 23-24, 26. In other words, our review "starts and stops" with the unambiguous statutory language. *Johnson v. Montgomery*, 151 Ohio St.3d 75, 2017-Ohio-7445, 86 N.E.3d 279, ¶ 15.

{¶ 14} Starting from the premise that R.C. 2923.122(D)(1)(a) permits school districts to authorize their employees to carry deadly weapons, appellants frame the issue as whether R.C. 109.78(D) "guts" R.C. 2923.122(D)(1)(a). The first dissenting opinion goes even further, remarkably asserting that because R.C. 2923.122(D)(1)(a) authorizes a school board to permit certain people to carry a firearm on school grounds and not be charged with a crime under R.C. 2923.122(A) or (B), "the analysis should end there," without even considering the independent requirements of R.C. 109.78(D). First dissenting opinion at ¶ 59. But the question here is neither whether a person may be criminally liable under R.C. 2923.122(A) or (B) nor the scope of a school board's authority to immunize a person from such liability pursuant to R.C. 2923.122(D)(1)(a). Rather, the question presented concerns the applicability of R.C. 109.78(D) to the facts before us, and specifically whether a school teacher, administrator, or other staff member who carries a firearm

while performing his or her job duties is employed in an "other position in which such person goes armed while on duty" under R.C. 109.78(D) and is therefore subject to the statute's training-or-experience requirement. We therefore begin by looking to the language of R.C. 109.78(D).

{¶ 15} Before turning to R.C. 109.78(D), however, we briefly address the first dissenting opinion's focus on the in pari materia canon of statutory construction, which provides that statutes that relate to the same subject matter "may be construed together, so that inconsistencies in one statute may be resolved by looking at [the] other statute on the same subject." *Black's Law Dictionary* 911 (10th Ed.2014). The first dissenting opinion states that "the heart" of the parents' argument is that this court must read R.C. 2923.122(D)(1)(a) with R.C. 109.78(D). First dissenting opinion at ¶ 48. It also states that reading the statutes in pari materia is necessary to our holding here. Yet neither the parents' merit brief nor this opinion—other than in response to the first dissenting opinion—refers to the in pari materia canon of construction. We review the plain and unambiguous language of the statues at issue independently; our understanding of one's meaning does not depend upon our understanding of the meaning of the other. But it is an unremarkable proposition that multiple statutes may apply to a single factual scenario and that we may not simply ignore any one of those statutes.

*The training or experience required by R.C. 109.78(D) applies to school employees who go armed while on the job*

{¶ 16} R.C. 109.78(D) prohibits a school from employing "a person as a special police officer, security guard, or other position in which such person goes armed while on duty" unless the person has satisfactorily completed basic peace-officer training or has 20 years of experience as a peace officer. Neither appellants nor the parents argue that R.C. 109.78(D) is ambiguous. Nevertheless, they offer diametrically conflicting readings of the statute's scope, based on their divergent interpretations of the language "or other position in which such person goes armed

while on duty." Appellants maintain that the statute's training-or-experience requirement applies only to employees who serve in safety or security positions that inherently require the employee to be armed, whereas the parents contend that the requirement applies to every school employee who goes armed while on the job, regardless of the employee's primary duties.

{¶ 17} R.C. 109.78(D) expressly prohibits a school from employing a person as a special police officer or security guard who has not satisfied the training-or-experience requirement. It then goes on to more broadly prohibit a school from employing a person who has not satisfied the training-or-experience requirement in an "other position in which [the employee] goes armed while on duty." *Id.* The crux of this case is the meaning of the phrase "other position in which [the employee] goes armed while on duty." We first consider the phrase "other position," reading the words in context and giving them their common, ordinary meanings. *See Cincinnati City School Dist. Bd. of Edn. v. State Bd. of Edn.*, 122 Ohio St.3d 557, 2009-Ohio-3628, 913 N.E.2d 421, ¶ 15. In the context of employment, the ordinary meaning of the word "position" is a job. *Random House Dictionary of the English Language* 1508-1509 (2d Ed.1987). And in the context of R.C. 109.78(D), "*other* position" plainly indicates a position that is not a special police officer or security guard—the two positions specifically mentioned in the statute. (Emphasis added.) *See Random House Dictionary of the English Language* at 1371 (defining "other" as "different or distinct from the one mentioned"). Applying the plain, ordinary meaning of the statutory language, a school employee who is not employed as a special police officer or security guard is employed in an "other position."

{¶ 18} We next consider the way that the statute limits the category of "other position[s]" that are subject to the training-or-experience requirement. R.C. 109.78(D) does not impose its training-or-experience requirement on every school employee who holds an "other position." The requirement applies only to an

employee who holds a position "in which [the employee] goes armed while on duty." *Id.* There would be no reason to require unarmed teachers, coaches, or janitors, for example, to undergo peace-officer training or to have extensive experience as a peace officer. But the up to ten school employees authorized under the board's resolution to carry deadly weapons while performing their job duties are different; they undertake the additional responsibility "to protect * * * students and staff from harm." The "other position" clause is limited to this class of employees.

{¶ 19} Based on R.C. 109.78(D)'s use of the phrase "other position in which such employee goes armed while on duty," appellants argue that the training-or-experience requirement applies only to an employee "in a *position*, the *duties* of which involve being armed." (Emphasis sic.) To accept that reading, we would have to add words to the statute. The General Assembly could have used the language that appellants suggest. But it chose not to state that the training-or-experience requirement applies to a person employed as a special police officer, security guard, or other position "the duties of which involve being armed." "[I]f the General Assembly could have used a particular word in a statute but did not, we will not add that word by judicial fiat." *Hulsmeyer v. Hospice of Southwest Ohio, Inc.*, 142 Ohio St.3d 236, 2014-Ohio-5511, 29 N.E.3d 903, ¶ 26, citing *In re Application of Columbus S. Power Co.*, 138 Ohio St.3d 448, 2014-Ohio-462, 8 N.E.3d 863, ¶ 26.

{¶ 20} Contrary to appellants' assertion, the express language of R.C. 109.78(D) does not tie application of the training-or-experience requirement to the nature or duties of the "other position." The statutory language instead ties application of that requirement to whether the employee "goes armed while on duty" in the employee's job. In the phrase "while on duty," the word "while" expresses the timing of an action. *See Random House Dictionary of the English Language* at 2165. Under the "other position" clause in R.C. 109.78(D), a school

employee who holds a position other than that of a special police officer or security guard is subject to the training-or-experience requirement if the employee "goes armed" *during the time* that the employee is performing his or her job duties, whatever those duties might be. The authorization letters that the superintendent issued to the employees designated to carry a firearm pursuant to the April 2018 resolution confirm this understanding of the statutory language. The letters state, "I authorize you to possess a firearm *while on duty* * * * as an additional safety measure to protect our students and staff from harm." (Emphasis added.)

{¶ 21} Amicus curiae Ohio Attorney General Dave Yost, urging reversal of the Twelfth District's judgment, makes an additional textual argument that R.C. 109.78(D) does not apply in this case because only *employment* triggers its application, whereas the resolution characterizes the staff members to be designated thereunder as "approved volunteers." While school employees might volunteer to be designated to carry a weapon pursuant to the resolution, the application of R.C. 109.78(D) is not dependent upon an employee having been hired particularly for the purpose of carrying a weapon. As we have already stated, the statute does not tie application of the training-or-experience requirement to the duties of an employee's position. That an employee might have been hired to teach, to coach, or to perform other primarily nonsecurity functions does not alter the fact that an employee who carries a weapon while performing his or her job "goes armed while on duty."

{¶ 22} Arguing in favor of a limited reading of R.C. 109.78(D), the attorney general also urges this court to read section (D) in the context of the whole statute. Our precedent requires courts to read a statute as a whole and to not dissociate words and phrases from that context. *See Electronic Classroom of Tomorrow v. Ohio Dept. of Edn.*, 154 Ohio St.3d 584, 2018-Ohio-3126, 118 N.E.3d 907, ¶ 11. Doing so here, however, does not alter our understanding of R.C. 109.78(D)'s plain language.

{¶ 23} R.C. 109.78(A) requires the executive director of the Ohio Peace Officer Training Commission to approve training programs designed to qualify persons for "positions as special police, security guards, or persons otherwise privately employed in a police capacity" and to "certify persons who have satisfactorily completed" such programs. A certificate of completion issued pursuant to that section or 20 years of experience as a peace officer satisfies "the educational requirements for appointment or commission as a special police officer or special deputy of a political subdivision [of the state.]" *Id.* R.C. 109.78(B) sets out duties of the executive director of the commission with respect to firearms training. And R.C. 109.78(C) establishes a peace-officer-private-security fund from which the commission administers those training programs.

{¶ 24} The attorney general suggests that R.C. 109.78, as a whole, is targeted toward training special police officers, security guards, and other persons privately employed in a police capacity. Based on that purported context, he urges this court to limit the meaning of the phrase "other position" in R.C. 109.78(D) to a position that serves a law-enforcement or security function. We disagree that the context of R.C. 109.78 justifies that limitation.

{¶ 25} The General Assembly could have expressly limited application of R.C. 109.78(D) to school-employed special police officers, security guards, and persons otherwise employed "in a police capacity." It used the phrase "employed in a police capacity" in R.C. 109.78(A) and the similar phrase "employment in a police capacity" in 109.78(C). In R.C. 109.78(D), however, it did not use a similar phrase to limit application of the training-or-experience requirement to special police officers, security guards, *and other school employees who serve in a police capacity*. Instead, it more broadly extended application of the requirement to other positions "in which [the employee] goes armed while on duty." *Id.* Despite the third dissenting opinion's suggestion that we should do so, we may not ignore that distinction. The General Assembly's "use of particular language to modify one part

of a statute but not another part demonstrates that [it] knows how to make that modification and has chosen not to make that modification in the latter part of the statute." *Hulsmeyer*, 142 Ohio St.3d 236, 2014-Ohio-5511, 29 NE.3d 903, at ¶ 26. Therefore, we will not interpolate the General Assembly's references elsewhere in R.C. 109.78 to employment "in a police capacity" as a limitation on the broader language used in R.C. 109.78(D). To the extent that the third dissenting opinion is correct in placing blame for inconsistencies within the statutory language of R.C. 109.78 on legislative inadvertence, the General Assembly may take up the cause to eliminate those inconsistencies.

{¶ 26} Perhaps recognizing that the plain language of R.C. 109.78(D), standing alone, does not support their position, appellants urge this court to apply the ejusdem generis rule of statutory interpretation to construe the statute. That rule provides:

> [W]here in a statute terms are first used which are confined to a particular class of objects having well-known and definite features and characteristics, and then afterwards a term having perhaps a broader signification is conjoined, such latter term is, as indicative of legislative intent, to be considered as embracing only things of a similar character as those comprehended by the preceding limited and confined terms.

*State v. Aspell*, 10 Ohio St.2d 1, 225 N.E.2d 226 (1967), paragraph two of the syllabus. Appellants ask this court to apply that rule and to construe the phrase "other position" in R.C. 109.78(D) as embracing only those positions that share a similar character with the specified positions of special police officer and security guard. That similar character, they contend, is law enforcement or the protection of others and the inherent necessity to be armed while performing such duties.

**{¶ 27}** Neither appellants' invocation of the ejusdem generis rule nor their application of the rule is persuasive. While firmly established as an interpretive rule, the ejusdem generis rule " 'is only an instrumentality for ascertaining the correct meaning of words when there is uncertainty.' " *United States v. Powell*, 423 U.S. 87, 91, 96 S.Ct. 316, 46 L.Ed.2d 228 (1975), quoting *Gooch v. United States*, 297 U.S. 124, 128, 56 S.Ct. 395, 80 L.Ed. 522 (1936). This court has frequently noted that we invoke rules of statutory interpretation only when the statutory language itself is subject to various interpretations. *See Symmes Twp. Bd. of Trustees v. Smyth*, 87 Ohio St.3d 549, 553, 721 N.E.2d 1057 (2000); *see also Hulsmeyer* at ¶ 22-23 (when statutory language is unambiguous, courts must rely on what the General Assembly has written). We may not "dig deeper than the plain meaning of an unambiguous statute 'under the guise of * * * statutory interpretation.' " *Jacobson v. Kaforey*, 149 Ohio St.3d 398, 2016-Ohio-8434, 75 N.E.3d 203, ¶ 8, quoting *Morgan v. Adult Parole Auth.*, 68 Ohio St.3d 344, 347, 626 N.E.2d 939 (1994). Here, the parties do not identify, nor does our independent review reveal, ambiguity in R.C. 109.78(D) that would call for this court to apply the rule of ejusdem generis.

**{¶ 28}** Even if the ejusdem generis rule were applicable, its application does not justify the limitation that appellants ask us to place on R.C. 109.78(D). The ejusdem generis rule encourages the limitation of a general category that follows specifically enumerated items as encompassing only items that are of the same nature as those specifically enumerated. *Glidden Co. v. Glander*, 151 Ohio St. 344, 350, 86 N.E.2d 1 (1949). But that begs the question: what is the similar character shared by special police officers and security guards that should limit the scope of the general phrase "or other position[s]" that follows the enumerated positions in R.C. 109.78(D)? *See Ali v. Fed. Bur. of Prisons*, 552 U.S. 214, 225, 128 S.Ct. 831, 169 L.Ed.2d 680 (refusing to apply ejusdem generis, in part because "it is not

14

apparent what common attribute connects the specific items"). Here, the statute itself answers that question.

{¶ 29} R.C. 109.78(D) expressly states the common attribute that links the specified positions of special police officer and security guard and the residual category of "other position[s]" that is likewise subject to the training-or-experience requirement: an employee who "goes armed while on duty." A person might be hired as a teacher, but when that person agrees to go armed while teaching, his or her duties expand to encompass additional duties akin to those normally performed by special police officers and security guards. Therefore, in this instance, we need not look beyond the statutory language to discern additional shared characteristics. Nevertheless, appellants urge this court to do so and to divine a more limiting common characteristic—a requirement inherent in the position itself that the employee be armed.

{¶ 30} The only "other position[s]" appellants identify that would qualify under their reading of R.C. 109.78(D) are school security officers (which they do not distinguish from the already specified "security guard") and school resource officers. But even those positions do not inherently require the employee to be armed. A recent article reported, for example, that the Columbus City School District employed 84 *unarmed* security officers during the 2019-2020 school year. Neese, *Columbus City Schools to reevaluate police resource officers*, The Columbus Dispatch (June 16, 2020), available at https://www.dispatch.com /story/news/crime/2020/06/17/columbus-city-schools-to-reevaluate-police-resource-officers/42183361/ (accessed June 1, 2021) [https://perma.cc/YJQ5-W8YM]. And in *In re L.G.*, 2017-Ohio-2781, 82 N.E.3d 52, ¶ 3 (2d Dist.), the court of appeals cited evidence that the Dayton Public School District's school resource officers do not carry weapons. Thus, even if the positions of special police officer and school security guard inherently require such employees to be armed, appellants have not identified any "other position" with the same inherent

requirement. We may not, under the guise of applying the rule of ejusdem generis, limit the phrase "other position" in such a way that it becomes meaningless. *See State v. Wells*, 146 Ohio St. 131, 135, 64 N.E.2d 593 (1945), citing 2 Sutherland, *Statutory Construction*, Section 4910, at 400 (3d Ed.1943) (the rule does not apply when the class is exhausted by the specific enumerations).

*R.C. 2923.122(D)(1)(a) does not permit a school to circumvent the requirements of R.C. 109.78(D)*

{¶ 31} We now turn to R.C. 2923.122, which does not alter our analysis of R.C. 109.78(D). R.C. 2923.122 criminalizes the possession in or conveyance into a school safety zone of a deadly weapon or dangerous ordnance, except by certain categories of people. Relevant here, that conduct is not criminal if it is committed by a person who acts in accordance with written authorization from a board of education or governing body of a school. R.C. 2923.122(D)(1)(a).

{¶ 32} Although the clear purpose of R.C. 2923.122, a criminal statute, is to define a criminal offense, appellants and amicus curiae Ohio Attorney General focus on the statute's exception to criminal liability and argue that R.C. 2923.122(D)(1)(a) affirmatively grants school boards nearly unbounded discretion to authorize a person (including a school employee) to possess weapons on school property and to determine how much training to require as a precondition of that authorization. The first dissenting opinion takes the bait, even going so far as to adopt the Attorney General's characterization of R.C. 2923.122 as the "authorizing statute." First dissenting opinion at ¶ 43. That characterization of the statute requires a significant leap that we are not willing to make.

{¶ 33} R.C. 2923.122(D)(1)(a) simply excludes certain categories of people from criminal liability for the offenses defined in R.C. 2923.122(A) through (C). By excepting from the operation of R.C. 2923.122 a person who acts in accordance with written authorization from a board of education or governing body of a school, R.C. 2923.122(D)(1)(a) does implicitly say that a board of education or governing

body of a school may authorize a person other than a law-enforcement officer or school security officer to convey into or possess in a school safety zone a deadly weapon or dangerous ordnance. Appellants accurately point out that the statute is silent as to limits on the exercise of that authority, but that is not surprising because R.C. 2923.122(D)(1)(a) addresses only the *effect* of prior authorization on the armed person's exposure to criminal liability, not the circumstances in which such authorization is appropriate to begin with. We conclude that R.C. 2923.122(D)(1)(a) does not clearly constitute a legislative grant of power for school boards to authorize their employees to go armed so long as the employees undergo whatever training a board might deem advisable.

{¶ 34} Nothing in R.C. 2923.122(D)(1)(a) suggests that a board of education or governing body of a school may authorize a person to possess in or convey into a school safety zone a deadly weapon or dangerous ordnance without regard to other statutory provisions that might apply. Indeed, appellants acknowledge that written authorization from a school board pursuant to R.C. 2923.122(D)(1)(a) does not override certain statutory requirements, including the requirement that a person be licensed by the state to carry a concealed handgun. *See* R.C. 2923.12(A) and (C)(2). A board of education's written authorization for a person to carry a concealed weapon in a school safety zone does not excuse the person from criminal liability if the person lacks a valid license to carry such a weapon. And contrary to the reasoning employed in the first dissenting opinion, the fact that the unambiguous language of R.C. 2923.122(D)(1)(a) does not expressly refer to R.C. 2923.12, which defines the offense of carrying a concealed weapon, does not somehow preclude the simultaneous application of both statutes to a single factual circumstance.

{¶ 35} The same logic applies to R.C. 109.78(D). If a school employee lacks the statutorily required training or experience to carry a deadly weapon while

on duty, the school board cannot circumvent the application of R.C. 109.78(D) by giving the employee written authorization to do so.

{¶ 36} There is no conflict between the authority of a school board implicitly recognized in R.C. 2923.122(D)(1)(a) and the limitation on the category of employees a school board may authorize to go armed while on duty under R.C. 109.78(D). Enforcement of R.C. 109.78(D) does not "gut" or render meaningless R.C. 2923.122(D)(1)(a), as appellants contend, because the training-or-experience requirement in R.C. 109.78(D) applies only to the limited class of school employees who go armed while on duty. R.C. 109.78(D) has no effect on a school board's discretion to authorize a person who is not a school employee or who is a school employee not on duty to carry a deadly weapon in a school safety zone.

{¶ 37} When the General Assembly enacted R.C. 2923.122 in 1992, *see* Am.Sub.H.B. No. 154, 144 Ohio Laws, Part II, 3198, 3220-3221, the training-or-experience requirement now set out in R.C. 109.78(D) had been in effect for more than 20 years, *see* former R.C. 109.78(B), Am.Sub.H.B. No. 575, 133 Ohio Laws 2398, 2400, and Am.H.B. No. 633, 134 Ohio Laws 2125. Had it perceived any conflict between the statutes, the General Assembly could have either amended R.C. 109.78 or included language in R.C. 2923.122 to the effect that the latter would control notwithstanding R.C. 109.78. But the General Assembly did neither.

{¶ 38} Despite the absence of a conflict between R.C. 109.78(D) and R.C. 2923.122(D)(1)(a), appellants argue that enforcing the training-or-experience requirement in R.C. 109.78(D) as to teachers, administrators, or other school staff creates an untenable distinction between school employees and persons who are not employed by the school. That concern, however, frames a question of policy for the General Assembly to address.

{¶ 39} In addition to appellants' concern about treating school employees differently from nonemployees, the extensive briefing in this appeal from both the parties and amici curiae contains impassioned arguments regarding the propriety of

18

arming teachers and other school staff and the training that should be required of such persons before they are permitted to go armed while on duty. Those questions, while vital in the context of the overarching policy debate, are outside this court's purview. It is a fundamental principle of the separation of powers that "the legislative branch [of government] is 'the ultimate arbiter of public policy.' " *Arbino v. Johnson & Johnson*, 116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 420, ¶ 21, quoting *State ex rel. Cincinnati Enquirer, Div. of Gannett Satellite Information Network, Inc. v. Dupuis*, 98 Ohio St.3d 126, 2002-Ohio-7041, 781 N.E.2d 163, ¶ 21. As this court may neither establish policy nor second-guess the General Assembly's policy choices, *Groch v. Gen. Motors Corp.*, 117 Ohio St.3d 192, 2008-Ohio-546, 883 N.E.2d 377, ¶ 212, such arguments are more appropriately directed to the General Assembly.

{¶ 40} To the extent that R.C. 109.78(D) and R.C. 2923.122(D)(1)(a) might fit together imperfectly, we bear in mind that the General Assembly likely did not contemplate at the time of those statutes' respective enactments in 1969 and 1992 that they would address a board of education's authority to arm its teachers and other school staff for protection against a school shooting. Unlike other state legislatures that have responded to more recent calls to arm teachers and other school staff by enacting legislation that is specifically tailored to that issue, *see, e.g.*, Kan.Stat.Ann. 75-7c10(d)(1), S.D.Codified Laws 13-64-1, Tenn.Code Ann. 49-6-815, and Tex.Educ.Code Ann. 37.0811, the General Assembly has not done so.[3] Nevertheless, because R.C. 109.78(D) and R.C. 2923.122(D)(1)(a) are unambiguous and do not conflict with each other, we must apply both statues as written unless and until the General Assembly directs otherwise by legislative

3. There is currently pending in the General Assembly a bill that would exclude from R.C. 109.78(D)'s training-or-experience requirement teachers and other school employees whom a school board authorizes to carry a firearm while on duty. *See* 2021 H.B. No. 99. As introduced, the bill states an express intention to overrule the Twelfth District Court of Appeals' decision below in this case.

action.  Applying both statutes as written, we hold that the training-or-experience requirement set out in R.C. 109.78(D) applies to persons employed by Ohio schools as teachers, administrators, or other staff members if the employee is to go armed while on duty.

### Conclusion

{¶ 41} R.C. 109.78(D) prohibits a school from employing a person who goes armed while on duty in his or her job unless the employee has satisfactorily completed an approved basic peace-officer-training program or has 20 years of experience as a peace officer.  And R.C. 2923.122(D)(1)(a) does not provide schools with a mechanism to circumvent that requirement.  Because the board's April 2018 resolution purports to authorize certain school employees to go armed while on duty without also requiring that those employees satisfy the training-or-experience requirement under R.C. 109.78(D), the resolution violates R.C. 109.78(D).  We therefore affirm the judgment of the Twelfth District Court of Appeals.

Judgment affirmed.

DONNELLY, STEWART, and BRUNNER, JJ., concur.

KENNEDY, J., dissents, with an opinion.

FISCHER, J., dissents, with an opinion.

DEWINE, J., dissents, with an opinion joined by FISCHER, J.

_____

**KENNEDY, J., dissenting.**

{¶ 42} In order for the majority to reach its conclusion that the basic peace-officer-training or peace-officer-experience requirement of R.C. 109.78(D) is a limitation on a school board's discretion to authorize its employees to carry firearms on school grounds, it must read R.C. 109.78(D) in pari materia with R.C. 2923.122(D)(1)(a).  However, two statutes may not be read in pari materia unless

one of the statutes expressly refers to the other or the statute being construed is ambiguous and both statutes relate to the same general subject matter.

{¶ 43} In this case, neither of the statutes at issue refers to the other, and the language of R.C. 2923.122(D)(1)(a) ("the authorizing statute"), which allows a school board to authorize any person to carry a deadly weapon while on school grounds, is plain and unambiguous. Even if R.C. 2923.122(D)(1)(a) were ambiguous, R.C. 109.78(D) does not relate to the same general subject matter as R.C. 2923.122; therefore, the in pari materia rule of construction does not apply. *See United Tel. Co. of Ohio v. Limbach*, 71 Ohio St.3d 369, 372-373, 643 N.E.2d 1129 (1994). According to the plain language of R.C. 2923.122(D)(1)(a), it negates criminal liability for a person carrying a firearm on school grounds when that person is authorized by the school board to do so. In contrast, R.C. 109.78(D) is a statute that sets the training-or-experience requirements for those hired by a school into a position in which the employee has the job responsibility to be armed while on duty. Consequently, I dissent from the majority's decision today and would reverse the judgment of the Twelfth District Court of Appeals and reinstate the summary judgment entered in favor of appellants, the Madison Local School District Board of Education ("the school board") and the district's superintendent.

**Facts and Procedural History**

{¶ 44} On April 24, 2018, the school board adopted a resolution pursuant to R.C. 2923.122(D)(1)(a) authorizing certain employees to possess a deadly weapon in the school safety zones of the district. In response, appellees, Erin Gabbard and other concerned parents (collectively, "Gabbard"), filed a two-count complaint in the Butler County Court of Common Pleas challenging the resolution. Count one sought a permanent injunction barring the school board from implementing the resolution.

{¶ 45} In the trial court, Gabbard argued that the school board could not authorize its employees to carry firearms on school grounds unless the employees

first complied with the requirements of R.C. 109.78(D). They also argued that the statute allowing a school board to authorize a person to carry a deadly weapon while on school grounds, R.C. 2923.122(D)(1)(a), does not abrogate the training-or-experience requirement in R.C. 109.78(D). The school board did not challenge Gabbard's reading of R.C. 109.78(D) but argued that R.C. 2923.122(D)(1)(a) is a carved-out exception to the training-or-experience requirement in R.C. 109.78(D).

{¶ 46} The trial court granted the school board's motion for summary judgment and denied Gabbard's claim for a permanent injunction. The Twelfth District Court of Appeals reversed that judgment, explaining that "[s]ince the resolution does not comply with the General Assembly's dictates in R.C. 109.78, we find Gabbard's permanent injunction must be granted." 2020-Ohio-1180, 153 N.E.3d 471, ¶ 21. This court accepted the school board's discretionary appeal to review that judgment. *See* 153 Ohio St.3d 1463, 2020-Ohio-3882, 150 N.E.3d 109.

**Law and Analysis**

{¶ 47} We review the grant or denial of summary judgment de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). In order to obtain summary judgment, the movant must show that "(1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion when viewing evidence in favor of the nonmoving party, and that conclusion is adverse to the nonmoving party." *Id.*, citing *State ex rel. Cassels v. Dayton City School Dist. Bd. of Edn.*, 69 Ohio St.3d 217, 219, 631 N.E.2d 150 (1994); *see also* Civ.R. 56(C).

{¶ 48} This case presents a question of statutory interpretation. The heart of Gabbard's argument is that to give effect to R.C. 2923.122(D)(1)(a), this court must read that statute in pari materia with R.C. 109.78(D). I disagree.

{¶ 49} De novo review applies to questions of statutory interpretation. *Ceccarelli v. Levin*, 127 Ohio St.3d 231, 2010-Ohio-5681, 938 N.E.2d 342, ¶ 8.

We owe no deference to the lower court's decision, nor are we limited to choosing between the different interpretations of a statute presented by the parties. *In re Determination of Existence of Significantly Excessive Earnings for 2017 Under the Elec. Sec. Plan of Ohio Edison Co.*, 162 Ohio St.3d 651, 2020-Ohio-5450, 166 N.E.3d 1191, ¶ 105 (Kennedy, J., concurring in judgment only in part and dissenting in part). "The parties may espouse arguments regarding the meaning of a statute, but in the end, it is the courts that have the authority and the duty to 'say what the law is.' " *Id.* (Kennedy, J., concurring in judgment only in part and dissenting in part), quoting *Marbury v. Madison*, 5 U.S. 137, 177, 2 L.Ed. 60 (1803).

{¶ 50} " 'The preeminent canon of statutory interpretation requires us to "presume that [the] legislature says in a statute what it means and means in a statute what it says there." ' " (Brackets added in *BedRoc, Ltd., L.L.C.*) *State ex rel. Lee v. Karnes*, 103 Ohio St.3d 559, 2004-Ohio-5718, 817 N.E.2d 76, ¶ 27, quoting *BedRoc Ltd., L.L.C. v. United States*, 541 U.S. 176, 183, 124 S.Ct. 1587, 158 L.Ed.2d 338 (2004), quoting *Connecticut Natl. Bank v. Germain*, 503 U.S. 249, 253-254, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992). As we explained in *Symmes Twp. Bd. of Trustees v. Smyth*, "[w]hen the language of a statute is plain and unambiguous and conveys a clear and definite meaning, there is no need for this court to apply the rules of statutory interpretation." 87 Ohio St.3d 549, 553, 721 N.E.2d 1057 (2000). Rather, "[a]n unambiguous statute is to be applied, not interpreted." *Sears v. Weimer*, 143 Ohio St. 312, 55 N.E.2d 413 (1944), paragraph five of the syllabus.

{¶ 51} When statutes or provisions in statutes explicitly refer to each other the statutes are to be construed in pari materia. *Ohio Bus Sales, Inc. v. Toledo Bd. of Edn.*, 82 Ohio App.3d 1, 7, 610 N.E.2d 1164 (6th Dist.1992). This court has also used the in pari materia rule of construction when some doubt or ambiguity exists in a statute. *See Herman v. Klopfleisch*, 72 Ohio St.3d 581, 585, 651 N.E.2d 995

(1995). "All statutes relating to the same general subject matter must be read in pari materia, and in construing these statutes in pari materia, this court must give them a reasonable construction so as to give proper force and effect to each and all of the statutes." *Id.*, *citing United Tel. Co. of Ohio*, 71 Ohio St.3d at 372, 643 N.E.2d 1129.

{¶ 52} In this case, the in pari materia rule of construction does not apply for three reasons. First, R.C. 109.78(D) is not explicitly referred to in R.C. 2923.122, let alone in R.C. 2923.122(D)(1)(a). Second, R.C. 2923.122(D)(1)(a) is not ambiguous. And lastly, even if R.C. 2923.122(D)(1)(a) were ambiguous, R.C. 109.78(D) may not be read in pari materia with it, because the statutes do not relate to the same general subject matter.

*R.C. 109.78(D) and R.C. 2923.122(D)(1)(a) do not explicitly refer to each other*

{¶ 53} The General Assembly made one reference to R.C. Chapter 109 in R.C. 2923.122. Specifically, R.C. 2923.122(D)(1)(b) provides that the criminal offense of unlawfully possessing a deadly weapon or dangerous ordnance in a school safety zone does not apply to the following:

> Any person who is employed in this state, who is authorized to carry deadly weapons or dangerous ordnance, and *who is subject to and in compliance with the requirements of section 109.801 of the Revised Code*, unless the appointing authority of the person has expressly specified that the exemption provided in division (D)(1)(b) of this section does not apply.

(Emphasis added.)

{¶ 54} R.C. 109.801 governs firearms-carrying requalification for the following:

> [A]ny peace officer, sheriff, chief of police of an organized police department of a municipal corporation or township, chief of police of a township police district or joint police district police force, superintendent of the state high patrol, state highway patrol trooper, or chief of police of a university or college police department; any parole or probation officer who carries a firearm in the course of official duties; any corrections officer of a multicounty correctional center, or of a municipal-county or multicounty-municipal correctional center * * *; the house of representatives sergeant at arms * * *; the senate sergeant at arms * * *; any tactical medical professional; or any employee of the department of youth services who is designated * * * as being authorized to carry a firearm while on duty.

{¶ 55} The lack of any reference to R.C. 109.78(D) in R.C. 2923.122 or R.C. 2923.122(D)(1)(a) is evidence that the statutes should not be read in pari materia. *See Ohio Bus Sales, Inc.*, 82 Ohio App.3d at 7, 610 N.E.2d 1164 (statutes or sections of statutes that explicitly refer to each other should be read in pari materia). "[T]he General Assembly, in enacting a statute, is assumed to have been aware of other statutory provisions concerning the subject matter of the enactment even if they are found in separate sections of the Code." *Meeks v. Papadopulos*, 62 Ohio St.2d 187, 191-192, 404 N.E.2d 159 (1980), citing *State ex rel. Darby v. Hadaway*, 113 Ohio St. 658, 659, 150 N.E. 36 (1925). There is evidence that the legislature knew how to refer to R.C. Chapter 109 in R.C. 2923.122, because it did so in R.C. 2923.122(D)(1)(b).

{¶ 56} Notably, in the statutory scheme regarding weapons control enacted through R.C. 2923.11 et seq., the General Assembly specifically refers to R.C. 109.78 and other provisions in R.C. Chapter 109. *See, e.g.*, R.C. 2923.11(N)(1)

and (2) (referring to R.C. 109.69); R.C. 2923.121(F)(2) (referring to R.C. 109.541); R.C. 2923.123(C)(4) (referring to R.C. 109.77). For a further example, R.C. 2923.125(B)(3)(c) permits an applicant for a concealed-handgun license to show that he or she "has satisfactorily completed and been issued a certificate of completion of a basic firearms training program, a firearms requalification training program, or another basic training program described in section 109.78 * * * of the Revised Code." The General Assembly therefore knows how to incorporate the certification required by R.C. 109.78 to establish a person's eligibility to carry a concealed weapon. In contrast, it did not condition a school board's authority to allow its employees to carry deadly weapons while on school grounds on the employees' having the certification required by R.C. 109.78.

{¶ 57} Therefore, in construing R.C. 2923.122(D)(1)(a), we must assume that the General Assembly chose not to make the training requirements of R.C. 109.78(D) a part of R.C. 2923.122(D)(1)(a). *See Maggiore v. Kovach*, 101 Ohio St.3d 184, 2004-Ohio-722, 803 N.E.2d 790, ¶ 27; *In re Election of Member of Rock Hill Local School Dist. Bd. of Edn.*, 76 Ohio St.3d 601, 608, 669 N.E.2d 1116 (1996). Had the legislature intended to do so, it could have chosen words to that effect or explicitly referred to R.C. 109.78(D) in R.C. 2923.122(D)(1)(a)—the authorizing statute. Because the legislature did not refer to R.C. 109.78(D) in R.C. 2923.122(D)(1)(a), the in pari materia rule of construction can apply only if R.C. 2923.122(D)(1)(a) is ambiguous and it and R.C. 109.78(D) relate to the same general subject matter.

*R.C. 2923.122(D)(1)(a) is plain and unambiguous*

{¶ 58} R.C. 2923.122 generally prohibits anyone, including teachers, other employees of a school district, and visitors, from possessing a firearm in a school safety zone. It is a criminal statute that regulates the conduct of individuals who carry firearms, not the hiring decisions of a local school district. R.C.

2923.122(D)(1)(a) provides exceptions to the criminal prohibition on carrying a firearm in a school safety zone for the following people:

> [A] law enforcement officer who is authorized to carry deadly weapons or dangerous ordnance, a security officer employed by a board of education or governing body of a school during the time that the security officer is on duty pursuant to that contract of employment, or *any other person who has written authorization* from the board of education or governing body of a school to convey deadly weapons or dangerous ordnance into a school safety zone or to possess a deadly weapon or dangerous ordnance in a school safety zone and who conveys or possesses the deadly weapon or dangerous ordnance in accordance with that authorization.

(Emphasis added.) *Id.*

{¶ 59} Relying on that provision, the school board resolved to give written authorization to people designated by the district's superintendent to carry firearms on school grounds. Any person—whether a teacher, administrator, custodian, or simply a member of the public—who has been given that written authorization and who carries a firearm in a school safety zone in the Madison Local School District in accordance with that authorization cannot be prosecuted for violating R.C. 2923.122(A) or (B). Importantly, R.C. 2923.122(D)(1)(a) places no other qualification on this exception. Because the statute permits the school board to grant written authorization to any person to carry a firearm on school grounds without imposing any limitation on the school board's discretion to do so, the analysis should stop there.

{¶ 60} The Twelfth District Court of Appeals, however, held that R.C. 109.78(D) prohibits a board of education from authorizing school employees to

carry firearms on school grounds unless the employee has received a certificate of having satisfactorily completed an approved basic peace-officer-training program or has 20 years of experience as a peace officer. 2020-Ohio-1180, 153 N.E.3d 471, at ¶ 17-19. The court of appeals' analysis in reaching that conclusion is flawed.

{¶ 61} The appellate court began from the premise that R.C. 109.78(D) applies to R.C. 2923.122(D)(1)(a)—the authorizing statute—without any prior analysis. The court rephrased the issue before it as "how much training a teacher or school employee must receive before carrying a firearm into a school safety zone while on duty." *Id.* at ¶ 14. But that was not the crux of the issue before the court.

{¶ 62} The school board adopted its resolution under the authority of R.C. 2923.122(D)(1)(a). Gabbard filed a complaint for a permanent injunction under the premise that in order for a person to legally carry a firearm in a school safety zone, that person must meet the training-or-experience requirement of R.C. 109.78(D).

{¶ 63} As set forth above, R.C. 109.78(D) is not explicitly referred to in R.C. 2923.122, let alone in R.C. 2923.122(D)(1)(a). Therefore, absent some ambiguity in R.C. 2923.122(D)(1)(a) and a determination that it and R.C. 109.78(D) relate to the same general subject matter, the two statutes should not be construed in pari materia, and we need look no further than the language of R.C. 2923.122(D)(1)(a) to discern its meaning.

{¶ 64} A statute is ambiguous " ' "if a reasonable person can find different meanings in the statute and if good arguments can be made for either of two *contrary* positions." ' " (Emphasis added in *Turner.*) *Turner v. Hooks*, 152 Ohio St.3d 559, 2018-Ohio-556, 99 N.E.3d 354, quoting *Sunset Estate Properties, L.L.C. v. Lodi*, 9th Dist. Medina No. 12CA0023-M, 2013-Ohio-4973, ¶ 20, quoting *4522 Kenny Rd., L.L.C. v. Columbus Bd. of Zoning Adjustment*, 152 Ohio App.3d 526, 2003-Ohio-1891, 789 N.E.2d 246, ¶ 13 (10th Dist.).

{¶ 65} But here, R.C. 2923.122(D)(1)(a)—the authorizing statute—is unambiguous and definite. No person who has authorization from the board of

education to possess a deadly weapon or dangerous ordnance in a school safety zone can be charged with a crime under R.C. 2923.122(A). R.C. 2923.122(D)(1)(a). Whether to grant that authorization is vested in the school board without limitation or qualification. When the meaning of a statute is unambiguous and definite, we apply it as written and have no occasion to interpret it. *State ex rel. Savarese v. Buckeye Local School Dist. Bd. of Edn.*, 74 Ohio St.3d 543, 545, 660 N.E.2d 463 (1996). Therefore, the analysis should end there and the trial court's grant of summary judgment in favor of the school board should be reinstated.

{¶ 66} The majority, however, like the appellate court, begins by reading R.C. 109.78(D) first instead of beginning with R.C. 2923.122(D)(1)(a), the statute that gives the school board the authority to authorize a person to carry a firearm on school grounds. But there is no need to consider any other statute in interpreting R.C. 2923.122(D)(1)(a). Still, even if R.C. 2923.122(D)(1)(A) were ambiguous, which it is not, R.C. 109.78(D) may not be read in pari materia with it to determine its meaning because the statutes do not relate to the same general subject matter.

*R.C. 109.78 does not relate to the same general subject matter as*
*R.C. 2923.122(D)(1)(a)*

{¶ 67} While it is true that both R.C. 2923.122(D)(1)(a) and R.C. 109.78(D) are statutes that concern schools and firearms, the statutes do not relate to the same general subject matter. R.C. 109.78(D) does not restrict the school board's discretion to authorize school employees to carry a deadly weapon or dangerous ordnance on school grounds, nor does it invalidate the exception from criminal liability afforded to those employees by R.C. 2923.122(D)(1)(a).

{¶ 68} Moreover, R.C. 109.78(D) is just one provision in the statutory scheme of R.C. 109.78. It cannot be read in isolation. "In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at

issue, as well as the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988).

{¶ 69} R.C. 109.78 is a statutory scheme that concerns, among other things, the certification and training of special police officers and security guards. The statute gives the executive director of the Ohio Peace Officer Training Commission ("POTC") the authority to certify persons who will serve as "*special police, security guards, or persons otherwise privately employed in a police capacity.*" (Emphasis added.) R.C. 109.78(A). The executive director also has the authority to certify basic firearms-training programs and firearms-requalification programs, and to determine whether prior firearms training that a person received is the equivalent of approved training. R.C. 109.78(B)(1) through (3). And R.C. 109.78(C) establishes a peace-officer-private-security fund in the state treasury to be used to administer the training programs that qualify persons for "*positions as special police, security guards, or other private employment in a police capacity.*" (Emphasis added.)

{¶ 70} R.C. 109.78 (D) states:

No public or private educational institution or superintendent of the state highway patrol shall employ a person as a special police officer, security guard, *or other position in which such person goes armed while on duty*, who has not received a certificate of having satisfactorily completed an approved basic peace officer training program, unless the person has completed twenty years of active duty as a peace officer.

(Emphasis added.)

{¶ 71} The phrase "in which such person goes armed while on duty" modifies and qualifies the word "position." *See Carter v. Youngstown Div. of*

*Water*, 146 Ohio St. 203, 209, 65 N.E.2d 63 (1946) (in construing a statute, "referential and qualifying words and phrases, where no contrary intention appears, refer solely to the last antecedent"). The word "position" is defined as "the group of tasks and responsibilities making up the duties of an employee." *Webster's Third New International Dictionary* 1769 (2002). Or put another way, one's position is defined by its job responsibilities and duties, and there is a distinction between the position itself and the employee who fills it. Pursuant to R.C. 109.78(D), then, a school board may fill a position in which the job duties require the employee to be armed only with someone who either has "a certificate of having satisfactorily completed an approved basic peace officer training program" or "has completed twenty years of active duty as a peace officer."

{¶ 72} Part of the General Assembly's stated purpose in enacting R.C. 109.78(D) was "to prohibit circumvention of the requirements for appointment as a peace officer." Am.Sub.H.B. No. 575, 133 Ohio Laws 2398, 2398. The legislature acted in an effort to preclude schools from giving de facto police powers to employees who had not completed peace-officer training, by classifying the employees as "special police officers," security guards," or something similar.

{¶ 73} This is confirmed by the structure of the statute. R.C. 109.78(D) requires those types of employees to have "a certificate of having satisfactorily completed an approved basic peace officer training program." Where do they get that certificate? R.C. 109.78(A) requires the executive director of the POTC to "certify persons who have satisfactorily completed approved training programs designed to qualify persons for positions as special police, security guards, or *persons otherwise privately employed in a police capacity* and issue appropriate certificates to such persons." (Emphasis added.) If a person is not seeking to qualify for the positions of special police officer or security guard, he or she can receive only a certificate to qualify for employment in a police capacity. Yet that same certificate is required for employees who go armed while on duty. R.C.

109.78(D) is therefore not triggered when a person has authorization from a school board to possess a deadly weapon on school grounds but rather it applies when the school hires an employee to serve in a police capacity.

{¶ 74} Statutes like R.C. 3317.06(P) confirm this reading to be correct. R.C. 3317.06(P) grants school districts the authority to

> *procure and pay for security services* from a county sheriff or a township or municipal police force or *from a person certified through the Ohio peace officer training commission*, in accordance with section 109.78 of the Revised Code, as a special police, security guard, or *as a privately employed person serving in a police capacity* for nonpublic schools in the district described in division (E)(1) of section 3317.024 of the Revised Code.

(Emphasis added.) This statute demonstrates that R.C. 109.78(A) and (D) must be read to limit a school district's decisions in employing someone in a police or police-like capacity.

{¶ 75} Moreover, if persons authorized to possess a deadly weapon or dangerous ordnance in a school safety zone were required to comply with the firearm-training requirements of R.C. 109.78(D), then would not the legislature also have required them to requalify to do so with all the other persons included in R.C. 109.801? But persons authorized to carry a firearm in a school safety zone under R.C. 2923.122(D)(1)(a) are not listed in R.C. 109.801. In fact, R.C. 2923.122 is referred to one time in R.C. Chapter 109, but only in the context of a statute concerning criminal-record checks.

{¶ 76} Reading the statutory scheme as a whole confirms that when the General Assembly required a person who is employed in a "position in which [the employee] goes armed while on duty" to have "a certificate of having satisfactorily

completed an approved basic peace officer training program," it did so because it contemplated the position to involve the employee acting in a police capacity, and if an employee is employed as a de facto police officer, the employee should be trained as one. R.C. 109.78(D) simply does not speak to a situation in which a school district decides to permit a person to carry a firearm on school grounds.

{¶ 77} That returns us to R.C. 2923.122(D)(1)(a). The exception to criminal liability for carrying a firearm in a school safety zone depends on a person's having written authorization from the school board to do so, which necessarily presupposes that the school board has the discretion to give that authorization in the first place. Obtaining such written authorization is not merely a benefit or term or condition of employment at a school, as it may be obtained by a school employee and other members of the general public alike. Therefore, when a school board gives a school employee written authorization to carry a firearm on school grounds, it does not change the position for which the employee was hired. Nor does such authorization mean that the school employee then serves the school district in a police capacity. The employee remains employed as a teacher, administrator, custodian, or other nonpolice position.

{¶ 78} Had the General Assembly intended to condition the authority to carry a firearm in a school safety zone on having the basic police training required of peace officers, it could have written the statute that way. It did not, and "a court may not rewrite the plain and unambiguous language of a statute under the guise of statutory interpretation," *Pelletier v. Campbell*, 153 Ohio St.3d 611, 2018-Ohio-2121, 109 N.E.3d 1210, ¶ 20.

{¶ 79} For these reasons, it is manifest that R.C. 109.78(D) does not prohibit a local school board from giving written authorization to a person to carry a firearm in a school safety zone under R.C. 2923.122(D)(1)(a). Because Gabbard has not pointed to any other provision limiting the school district's discretion to give that authorization, I would reverse the judgment of the Twelfth District Court

of Appeals and reinstate the trial court's grant of summary judgment to the school board.

_____

**FISCHER, J., dissenting.**

{¶ 80} We all want the best for our children—for them to be able to learn and grow in a safe environment. And there are differing opinions on how to achieve that goal. But it is the responsibility of the General Assembly, not this court, to weigh policy concerns and make legislative choices for the benefit of all Ohioans. *Groch v. Gen. Motors Corp.*, 117 Ohio St.3d 192, 2008-Ohio-546, 883 N.E.2d 377, ¶ 212. This court's job is merely to interpret the laws enacted by the General Assembly. *Id.* We are not to invade the role of the legislature to write laws and make policy determinations. *See Jacobson v. Kaforey*, 149 Ohio St.3d 398, 2016-Ohio-8434, 75 N.E.3d 203, ¶ 8.

{¶ 81} After reviewing the statutes at issue here, all roads lead a single conclusion: appellant Madison Local School District Board of Education may provide written authorization for its nonsecurity employees to carry weapons while on school property without requiring those employees to complete basic peace-officer training. In other words, R.C. 109.78(D) does not apply here.

{¶ 82} I agree with the statutory analyses set forth in the third dissenting opinion and I join that opinion in full. Additionally, I must point out that while I believe that the plain language of R.C. 109.78(D) and a common-sense reading of it clearly indicates that the statute's requirements apply to only those individuals who are employed in a security capacity, another rule of statutory construction— expressio unius est exclusio alterius—also compels that conclusion.

{¶ 83} The canon of expressio unius est exclusio alterius means that the expression of one or more items of a class implies that those not identified are to be excluded from the class. *State v. Droste*, 83 Ohio St.3d 36, 39, 697 N.E.2d 620 (1998). The canon does not apply to every statutory listing or grouping.

*Summerville v. Forest Park*, 128 Ohio St.3d 221, 2010-Ohio-6280, 943 N.E.2d 522, ¶ 35. "[I]t has force only when the items expressed are members of an 'associated group or series,' justifying the inference that items not mentioned were excluded by deliberate choice, not inadvertence." *Id.*, quoting *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168, 123 S.Ct. 748, 154 L.Ed.2d 653 (2003), citing *United States v. Vonn*, 535 U.S. 55, 65, 122 S.Ct. 1043, 152 L.Ed.2d 90 (2002). The canon depends on identifying a series of two or more terms that should be understood to go hand-in-hand, and the failure to include a term that has been left out indicates the legislature's intent to exclude it. *Summerville* at ¶ 36.

{¶ 84} R.C. 109.78(D) prohibits a "public or private educational institution or superintendent of the state highway patrol" from employing a person "as a special police officer, security guard, or other position in which such person goes armed while on duty" who has not completed basic peace-officer training or 20 years of active duty as a peace officer. The General Assembly recognized that educational institutions, which employ numerous teachers, should not be permitted to hire various types of security personnel who lack training. But the General Assembly did not include in the list the term "teachers," who are not employed to go armed while on duty, and it is unreasonable to argue that they were meant to be subject to R.C. 109.78(D)'s requirements.

{¶ 85} The bottom line is that the plain language of R.C. 109.78(D) does not include nonsecurity school employees, including teachers, in its list of individuals who are required to have peace-officer training in order to carry a weapon while on school grounds. And this court has to apply the statute as written. If the General Assembly had wished to prohibit nonsecurity personnel, like teachers, from carrying weapons while on school property without the required training, it could have done so and may still do so. This court does not have the authority to make that requirement. *Kaminski v. Metal & Wire Prods. Co.*, 125 Ohio St.3d 250, 2010-Ohio-1027, 927 N.E.2d 1066, ¶ 61.

**{¶ 86}** Therefore, I respectfully dissent.

————————————

**DEWINE, J., dissenting.**

**{¶ 87}** In 2016, a student in Middletown, Ohio, opened fire in his school's cafeteria, wounding four other students. The Madison Local School District Board of Education responded by adopting a series of measures designed to prevent another shooting and to better protect its students should an active-shooter situation again occur. At issue here is one of those measures. The board authorized a limited number of teachers and staff members who possessed concealed-handgun permits to carry firearms on school property. These teachers were required to complete 24 hours of active-shooter training, hold a handgun-qualification certificate, receive training on mental preparation to respond to active killers, and undergo a mental-health exam, a criminal-background check, and drug screening.

**{¶ 88}** An Ohio statute says that a school board may by written authorization allow an individual to carry a deadly weapon in a school safety zone and provides that one who acts pursuant to such authorization is exempt from criminal liability for doing so. *See* R.C. 2923.122(B) and (D)(1)(a). Nonetheless, a majority of this court today decides that the board's decision to authorize its teachers to carry firearms violated Ohio law. It concludes that the board may authorize teachers to carry firearms only if the teachers fulfill the training standards applicable to security guards and special police officers. Under that view, a teacher who carries a firearm at school must meet the requirements of R.C. 109.78(D) ("the peace-officer-training provision"): that is, they must either complete a basic peace-officer-training program[4] or, in the alternative, have at least 20 years of experience as a peace officer.

---

4. Basic peace-officer-training programs in Ohio require more than 700 hours of education in areas including driving, conducting traffic stops, performing field sobriety tests, testifying in court, investigating human trafficking, and homeland security. *See* Ohio Adm.Code 109:2-1-16; Ohio

{¶ 89} To reach its conclusion, the majority finds it necessary to forsake a plain reading of the peace-officer-training statute. Instead, it adopts a strained reading of the statute that is at odds with the way ordinary speakers of the English language read texts. As I will explain, properly understood, the peace-officer-training provision applies only to persons employed in a security-related position and does not bar Madison Local from adopting the policy at issue. I therefore dissent.

## I. Reading the peace-officer-training provision

### A. The text of the provision

{¶ 90} The peace-officer-training provision states:

> No public or private educational institution or superintendent of the state highway patrol shall employ a person as a special police officer, security guard, or other position in which such person goes armed while on duty, who has not received a certificate of having satisfactorily completed an approved basic peace officer training program, unless the person has completed twenty years of active duty as a peace officer.

R.C. 109.78(D). By its terms, that provision prohibits a school from employing a person in certain positions unless the person has satisfied the statutory training requirements. Thus, whether the training requirements apply depends on whether the person is employed in one of the positions described.

{¶ 91} The statute makes two of the positions explicit: "special police officer" and "security guard." *Id.* Then it lists a third, broader category: "other

Attorney General Peace Officer Training Academy, *How To Become a Peace Officer in Ohio*, available at https://www.ohioattorneygeneral.gov/How-to-Become-a-Peace-Officer-in-Ohio (accessed Apr. 13, 2021) [https://perma.cc/6AS8-9JDS].

position in which such person goes armed while on duty." *Id.* The dispute in this case is whether teachers are included in this third category.

{¶ 92} And that question seems to answer itself. Is the position of teacher a "position in which such person goes armed while on duty?" No, going armed on duty is not part of the "position" of being a teacher. True, the board has authorized a small number of teachers who hold valid concealed-handgun permits to carry their firearms at school. But carrying firearms is not part of their job description—it is not part of the position of being a teacher. Indeed, under the policy, most people holding the position of teacher at Madison Local schools would not carry firearms.

{¶ 93} The majority, though, reaches a different result. It reads the phrase "other position in which such person goes armed while on duty" to include any school staff member who carries a weapon at school. It says that the word "position" in the statute simply refers to the fact that the person has a job at the school. In the majority's view, because a teacher holds a "position" at the school, and because some teachers have been authorized to carry firearms while they teach, those teachers therefore hold a "position" in which they "go armed while on duty."

{¶ 94} The majority gets there by interpreting each word in the phrase in isolation. It recites dictionary definitions of the words "position," "other," and "while." Then, once it has told us a dictionary meaning of each word, it strings those individual definitions together and comes up with what it says is the meaning of the whole sentence.

{¶ 95} But that is not how anyone reads or understands language. Instead, words are grouped together to form clauses and sentences and paragraphs that, as a whole, convey information to the reader. This is why we have said that "[e]valuating the context in which a word is written is essential to a fair reading of the text." *Great Lakes Bar Control, Inc. v. Testa*, 156 Ohio St.3d 199, 2018-Ohio-5207, 124 N.E.3d 803, ¶ 9. Our goal in reading a text should be "to discern literal meaning in context" and avoid a hyperliteral, " 'viperine' construction that kills the

text." Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 40 (2012). The majority's reading tends toward the latter. By zeroing in on each word in isolation, it loses its grasp on the meaning of the provision as a whole. *See New York Trust Co. v. Commr. of Internal Revenue*, 68 F.2d 19, 20 (2d Cir.1933) ("a sterile literalism * * * loses sight of the forest for the trees").

{¶ 96} The majority's analysis goes like this: (1) a "position" is a job, (2) "other position" means any employment other than as a special police officer or security guard, and (3) "while" means during—so what the provision really means is that *no person who has a job at a school may carry a weapon during the time that he is on duty unless he has met the requirements of the peace-officer-training provision*.

{¶ 97} But, of course, if the legislature meant to say that, why wouldn't it have said that? If we go back to the statute, we can easily see the problems with the majority's analysis. So here it is again: "No public or private educational institution * * * shall employ a person as a special police officer, security guard, or other position in which such person goes armed while on duty" who has not satisfied the training requirements. R.C. 109.78(D).

{¶ 98} To start, the statute is directed at whom a school may employ: it forbids a school from *employing* a person in a *position in which* the person goes armed while on duty. The provision does not refer to a person who holds a "position" and just happens to "go armed" while working in that position. It applies to a person who is *employed* in a *position in which* the person goes armed while on duty. The provision's focus is on the position in which the person is employed— that is, whether it is a *position in which* the person goes armed.

{¶ 99} The majority's reading would also render much of the peace-officer-training statute redundant. The provision is already limited in its scope to employees: as explained above, it prohibits a school from *employing* a person in a specified position unless that person has undergone the appropriate training. The

phrase "other position" must mean something other than the fact that the person holds a job at the school, otherwise it would add nothing to the provision.

{¶ 100} This becomes even more clear when we look at the listed positions—"special police officer, security guard, or other position in which such person goes armed while on duty"—together. R.C. 109.78(D). A person reading the sentence and encountering the phrases "special police officer" and "security guard" naturally assumes that the phrase "other position" must mean a similar security-related position. Why is this the natural reading? Because that's the way we tend to use language. If a parent tells a child, *don't forget your bat, baseball glove, uniform, and other equipment*, we all understand that the parent isn't asking the child to also bring his football helmet. And that's the problem with the majority's analysis—read in isolation, a football helmet is equipment, but from context, we all know that that's not what the parent is referring to.

{¶ 101} Reading the phrase "other position in which such person goes armed while on duty" as being of the same ilk as a special police officer and security guard is also the most natural reading, because to read the phrase more broadly would make it unnecessary to list special police officers and security guards at all. In other words, if the phrase "other position" truly includes any position at the school, the third item on the list would swallow up the first two and there would have been no reason for the General Assembly to have enumerated them. Thus, the majority's conclusion that the "other position" clause applies to any position at the school renders the statute's references to the specific positions meaningless.

B. *The principle of ejusdem generis*

{¶ 102} Though the interpretative process I have described is one that we all use every day without thinking much about, it is also a canon of statutory interpretation that goes by the name "ejusdem generis." This principle tells us that " '[w]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those

objects enumerated by the preceding specific words.' " *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114-115, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001), quoting 2A N. Singer, *Sutherland Statutes and Statutory Construction*, Section 47.17 (1991). The ejusdem generis rule "parallels common usage." Scalia & Garner, *Reading Law* at 199. It reflects the natural reading of the text, because construing the general clause too broadly would render the specifically enumerated categories superfluous. *See Sutherland Statutes and Statutory Construction* at Section 47.17, quoting *Rex v. Wallis*, 5 TR 375, 101 Eng.Rep. 210 (1793) ("had a legislature intended the general words to be used in their unrestricted sense, it would have made no mention of the particular words, but would have used 'only one compendious' expression"). Thus, "[w]hen the initial terms all belong to an obvious and readily identifiable genus, one presumes that the speaker or writer has that category in mind for the entire passage." *Reading Law* at 199.

{¶ 103} The rationale underpinning the canon of ejusdem generis implicates another principle commonly employed to understand the plain meaning of a statute: the "surplusage canon." *Id.* at 174. This mode of interpretation provides that when possible, a statute should be construed so as to give effect to every word used, and "[n]one should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence." *Id.* Courts generally presume a legislature not to have put redundant words or phrases into a statute. *See Kungys v. United States*, 485 U.S. 759, 778-779, 108 S.Ct. 1537, 99 L.Ed.2d 839 (1988) (plurality opinion); *Buddenberg v. Weisdack*, 161 Ohio St.3d 160, 2020-Ohio-3832, 161 N.E.3d 603, ¶ 10.

{¶ 104} The majority claims that the principle of ejusdem generis supports its view of the peace-officer-training provision. In doing so, it misunderstands and misapplies the rule. First, the majority fails to identify the true thread linking the positions of "special police officer" and "security guard" with those "other position[s] in which [the employee] goes armed while on duty," R.C. 109.78(D).

Employing its words-in-isolation approach to interpretation, the majority concludes that the class consists of any school employees who are authorized to carry a gun while they work. This circular reasoning misses the import of the provision. The general clause refers to *other positions in which* the employee goes armed while on duty immediately after listing two specific, security-related positions in which the employee goes armed while on duty. The link is the position—the clause applies to the category of security-related positions in which the employee goes armed while on duty.

{¶ 105} The majority contends that construing the general "other positions" clause to include other armed, security-related positions renders that clause meaningless. Not so. The clause serves as a catch-all so that the legislature need not enumerate every conceivable security-related job, and the catch-all accounts for other security-related positions that might not technically be considered a "special police officer" or a "security guard." *See* N. Singer, *Sutherland Statutes and Statutory Construction* at Section 47.17 ("Ejusdem generis is a common drafting technique designed to save a legislature from spelling out in advance every contingency in which a statute could apply").

{¶ 106} It is true that "when the specifics exhaust the class and there is nothing left besides what has been enumerated, the follow-on general term must be read literally." Scalia & Garner, *Reading Law* at 209. But the mere fact that the majority can't seem to think of any security-related positions beyond those of special police officer or security guard does not mean that such positions don't exist or won't exist in the future. Indeed, the majority discusses one conceivable security-related position at length—that of the school resource officer. It rejects the argument that the "other position" clause might cover school resource officers on the basis that not every school resource officer carries a gun while on duty. But many school resource officers are armed as part of their position. *See* National Association of School Resource Officers, Frequently Asked Questions, available at

42

https://www.nasro.org/faq/ (accessed Apr. 13, 2021) [https://perma.cc/HSY4-CHBJ] ("Are school resource officers usually armed? Yes"). Surely those officers would fall into the category of people employed in a security-related position in which they go armed while on duty.

{¶ 107} Moreover, the majority considers the possibility of security-related positions only in the context of schools. In doing so, it forgets that the training provision also prohibits the "superintendent of the state highway patrol" from "employ[ing] a person as a special police officer, security guard, or other position in which such person goes armed while on duty," if that person has not completed the requisite training. R.C. 109.78(D). This is the rub of the majority's failure to consider the *entire* provision. There may be any number of security-related positions in which a state-highway-patrol employee is required to go armed while on duty that don't fall into the categories of special police officer or security guard.

{¶ 108} Thus, there is no reason to think that the two enumerated positions of special police officer and security guard "exhaust the class," *Reading Law* at 209, of security-related jobs. Consider an example from another case dealing with a state tax on liquid carbonic-acid gas "used in the preparation * * * of soft drinks or other beverages, or for any other purpose." *Knoxtenn Theatres, Inc. v. McCanless*, 177 Tenn. 497, 151 S.W.2d 164, 165 (1941). Because the term "soft drinks or other beverages" plainly exhausted the class of beverages, the court concluded that the legislature must have intended for the general clause "or for any other purpose" to extend beyond the category of beverages—otherwise, the general clause would have no effect. *Reading Law* at 210, citing *Knoxtenn Theatres* at 165-166. That is simply not the situation presented here.

{¶ 109} In short, the "other position" clause is vague, perhaps intentionally so. The legislature often employs general terms "to cover a multitude of situations"—or in this case, positions—"that cannot practicably be spelled out in detail or even foreseen." Scalia & Garner, *Reading Law* at 32-33. But vagueness,

which is distinct from ambiguity, "can often be clarified by context." *Id*. at 33. Ejusdem generis is simply a tool for discerning the meaning of vague words in context. *See id*.

### C. Reviewing the context of the statute as a whole

{¶ 110} As illustrated above, the plain text of the peace-officer-training provision demonstrates that its training requirements apply only to those people holding security-related positions at schools. Should there be any lingering doubt, however, the scope and context of the statute as a whole provide further support for that reading. As the United States Supreme Court has explained:

> Whether a statutory term is unambiguous * * * does not turn solely on dictionary definitions of its component words. Rather, the plainness or ambiguity of statutory language is determined not only by reference to the language itself, but as well by the specific context in which that language is used, and the broader context of the statute as a whole.

*Yates v. United States*, 574 U.S. 528, 537, 135 S.Ct. 1074, 191 L.Ed.2d 64 (2015) (cleaned up).

{¶ 111} R.C. 109.78 is part of the chapter of the Revised Code addressing the powers of the attorney general, *see* R.C. Chapter 109, and it is located among a string of statutes addressing the training and certification of law-enforcement and peace officers, *see generally* R.C. 109.71 through 109.803.

{¶ 112} R.C. 109.78 begins by addressing the establishment of training programs and certification for people privately employed in a police capacity. R.C. 109.78(A). It provides for the certification of firearms-training programs for private investigators and security-services officers licensed under R.C. Chapter

4749.  R.C. 109.78(B).  And it further establishes a fund to be used in administering peace-officer-training programs.  R.C. 109.78(C).

{¶ 113} Thus, the training provision of R.C. 109.78(D) is nestled in a statute solely addressing training for people privately employed in a security or police capacity.  And the language in the training provision dates to the time of the statute's enactment in 1969.  *See* former R.C. 109.78(B), 1969 Am.Sub.H.B. No. 575, 108 Ohio Laws 2398, 2400 ("No public or private educational institution shall employ a person as a special policeman, security guard, or other position in which such person goes armed while on duty, who has not received a certificate of having satisfactorily completed an approved basic peace officer training program").

{¶ 114} But the majority resists the contextual implications of the statute. It says that if the General Assembly had meant for the training provision to be limited to security-related positions, it should have used the phrase "employed in a police capacity," since it used that language elsewhere in the statute.  Majority opinion at ¶ 25.  The majority's rationale is that because the legislature used different language in the training provision, it must have intended for the "other position" clause to mean something beyond jobs in which the person works in a police capacity.

{¶ 115} Here, the majority is relying on the canon of statutory interpretation known as the "presumption of consistent usage," Scalia & Garner, *Reading Law* at 170.  That principle provides that "*material* variation in terms suggests a variation in meaning."  (Emphasis added.)  *Id*.  "[M]ore than most other canons, this one assumes a perfection of drafting that, as an empirical matter, is not often achieved." *Id*.  Practically applied, this canon can in some cases be instructive.  But because it is so often disregarded by the legislature, it is "particularly defeasible by context." *Id*. at 171.

{¶ 116} I do not suggest that we should simply ignore variations in the statutory language.  But courts should not do what the majority does, which is

dismiss overwhelming textual evidence supporting one interpretation simply because that interpretation does not fit neatly within one linguistic canon. Rather, courts must assess the "clarity and weight" of arguably conflicting "clues" about the meaning of a statute and determine where the balance lies. *Id*. at 59. It may well be that the legislature viewed the security-related positions in the highway-patrol and school contexts to encompass positions other than those in which a person is employed in a "police" capacity; or, it may be that the legislature was simply inconsistent. Regardless, the use of different language in the training provision does not manifest a plain legislative meaning sufficient to overcome the clear import of the text of the training provision and the context of the statute as a whole.

{¶ 117} In short, both the language of the training provision and the context in which that provision is found overwhelmingly point to one conclusion—that the provision applies only to people employed by a school in a security-related position. It does not apply to teachers.

### III. The majority's flawed approach to the interpretation of legal texts

{¶ 118} One other aspect of the majority's opinion warrants further comment. The majority perpetuates a misguided belief that we may not refer to canons of statutory interpretation unless a statute is ambiguous. But this rather cramped view of statutory interpretation misunderstands the relationship between canons of statutory construction and discernment of the plain meaning of a given text.

{¶ 119} Under the plain-meaning rule, "if the text of a statute is unambiguous, it should be applied by its terms without recourse to policy arguments, legislative history, or any other matter extraneous to the text." Scalia & Garner, *Reading Law* at 436. In other words, when the statutory language is unambiguous, courts should not rely on extrinsic information to discern the meaning of the statute, but should instead conduct a "careful examination of the

ordinary meaning and structure of the law itself." *Food Marketing Inst. v. Argus Leader Media*, ___ U.S. ___, 139 S.Ct. 2356, 2364, 204 L.Ed.2d 742 (2019).

{¶ 120} This does not mean that a court is forbidden from using intrinsic linguistic tools to understand a statute's plain meaning. Courts use linguistic aids to understand the plain meaning of text all the time. For instance, courts often rely on dictionaries to pinpoint the ordinary meaning of undefined terms. *See, e.g.*, *Campus Bus Serv. v. Zaino*, 98 Ohio St.3d 463, 2003-Ohio-1915, 786 N.E.2d 889, ¶ 21; *Food Marketing Inst.* at ___, 139 S.Ct. at 2363.

{¶ 121} This court also frequently employs fundamental canons of interpretation to understand and explain the plain meaning of a text. For example, we regularly cite the canon that the terms of a statute should be read in the context of the statute as a whole. *See, e.g.*, *Vossman v. AirNet Sys., Inc.*, 159 Ohio St.3d 529, 2020-Ohio-872, 152 N.E.3d 232, ¶ 14, citing R.C. 1.42; *see also Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401, 408, 131 S.Ct. 1885, 179 L.Ed.2d 825 (2011). This is sometimes referred to as the "whole-text canon." *Reading Law* at 167. We also routinely say that courts must give effect to all of a statute's terms and avoid a construction that renders any part of the statute superfluous. *See Buddenberg*, 161 Ohio St.3d 160, 2020-Ohio-3832, 161 N.E.3d 603, at ¶ 10, 14 (plurality opinion); *State v. Reed*, 162 Ohio St.3d 554, 2020-Ohio-4255, 166 N.E.3d 1106, ¶ 15. Again, this is known as the "surplusage canon." *Reading Law* at 174. And, believe it or not, courts also apply the canon of ejusdem generis to explain the plain meaning of a text. *See, e.g.*, *Circuit City Stores*, 532 U.S. at 114-115, 121 S.Ct. 1302, 149 L.Ed.2d 234; *State v. Aspell*, 10 Ohio St.2d 1, 4, 225 N.E.2d 226 (1967). Like other canons, ejusdem generis is "one of various factors to be considered in the interpretation of a text." *Reading Law* at 212.

{¶ 122} Indeed, the majority employs many such canons in explaining what it believes is the clear and unambiguous meaning of the statute. It relies on canons stating that words should be given their ordinary meanings in accordance with the

rules of grammar and common usage, that the text should be read as a whole, that the legislature is presumed to have meant something different when it uses differing terms, and that the court should avoid interpretations that fail to give meaning to every part of the text. That it does so is natural. This is because any time we read language, we necessarily interpret it. *See* Scalia & Garner, *Reading Law* at 53, quoting Fish, *Is There a Text in This Class?* (1980) (" 'if you seem to meet an utterance which doesn't have to be interpreted, that is because you have interpreted it already' ").

{¶ 123} Many of the recognized canons of interpretation are merely descriptions of how we naturally interpret language to begin with. They are simply lawyers' ways of explaining how we intuitively read and understand text. The canon of ejusdem generis falls easily into this category and is no less relevant than any of the canons used by the majority. It is "one of the factors to be considered, along with context and textually apparent purpose, in determining the scope" of the general clause. *Reading Law* at 213.

{¶ 124} It is simply not the case that we must first declare a text ambiguous in order to rely on established canons of interpretation. The United States Supreme Court illustrated this point just this term. In *Facebook, Inc. v. Duguid*, ___ U.S. ___, 141 S.Ct. 1163, 209 L.Ed.2d 272 (2021), the court addressed the meaning of a provision of the Telephone Consumer Protection Act, 47 U.S.C. 227. To understand the plain meaning of the statutory text, the court began by applying a canon of interpretation (there, the "series-qualifier canon"). *Duguid* at ___, 144 S.Ct. at 1169. The court did not first declare the statute at issue to be ambiguous before consulting canons of interpretation; instead, it explained that the canon most applicable to that case "generally reflects the most natural reading of a sentence." *Id.* The same can be said for other linguistic canons of interpretation: "Properly regarded," they are "presumptions about what an intelligently produced text

conveys." *Reading Law* at 51; *see also Duguid* at ___, 144 S.Ct. at 1173-1174 (Alito, J., concurring).

### III. Conclusion

{¶ 125} By a plain reading, R.C. 109.78(D) does not prohibit Madison Local from authorizing school staff employed in nonsecurity-related positions to legally carry weapons on school property without having to satisfy the peace-officer-training requirements. Because the majority comes to a different conclusion, I respectfully dissent.

FISCHER, J., concurs in the foregoing opinion.

———————————

Bloomekatz Law and Rachel S. Bloomekatz; and Everytown Law, Alla Lefkowitz, and James Miller, for appellees.

Frost Brown Todd, L.L.C., Matthew C. Blickensderfer, Brodi J. Conover, and W. Joseph Scholler, for appellants.

Bolek Besser Glesius, L.L.C., and Matthew D. Besser; and Gwen E. Callender, urging affirmance for amicus curiae Fraternal Order of Police of Ohio, Inc.

Brian Eastman and Matthew Cooper-Whitman, urging affirmance for amicus curiae Ohio Education Association.

Muskovitz & Lemmerbrock, L.L.C., Susan Muskovitz, and Brooks W. Boron, urging affirmance for amicus curiae Ohio Federation of Teachers.

Vorys, Sater, Seymour & Pease, L.L.P., and Daniel E. Shuey, urging affirmance for amicus curiae Professor Peter M. Shane.

Cooper & Elliott, L.L.C., C. Benjamin Cooper, and Sean R. Alto, urging affirmance for amici curiae Experts in School Safety and Firearms Training.

Warren Terzian, L.L.P., and Thomas D. Warren, urging affirmance for amici curiae Teacher Educators and Educational Researchers.

Law Offices of John C. Camillus, L.L.C., and John C. Camillus, urging affirmance for amici curiae Ohio K-12 Teachers and Staff.

Zach Klein, Columbus City Attorney, Richard N. Coglianese, City Solicitor General, and Adam S. Friedman, Deputy Solicitor General, urging affirmance for amicus curiae city of Columbus.

Andrew W. Garth, City Solicitor, urging affirmance for amicus curiae city of Cincinnati.

Dave Yost, Attorney General, Benjamin M. Flowers, Solicitor General, Michael J. Hendershot, Chief Deputy Solicitor General, and Kyser S. Blakely, Deputy Solicitor General, urging reversal for amicus curiae Attorney General Dave Yost.

Lyons & Lyons Co., L.P.A., and Jonathan N. Fox, urging reversal for amici curiae Claymont City Schools, East Guernsey Local Schools, Edgerton Local Schools, Hardin Community School, Hardin-Houston Local Schools, Jackson Center Local Schools, Mad River Local Schools, Manchester Local Schools, Morgan Local Schools, New Lebanon Local Schools, Noble Local Schools, River View Local Schools, Rolling Hills Local School District, Russia Local Schools, Sidney City Schools, Streetsboro City Schools, and Upper Scioto Valley School District.

_____